**Simon KLEIN and Ruth Klein**

v.

**COUNCIL, OF CHEMICAL ASSOCIATIONS, Chemical Industry Institute of Toxicology, National Association of Printing Ink Manufacturers, Inc., Printing Industries of America, the Dow Chemical Company, Eastman Kodak Company, Minnesota Mining & Manufacturing Company, Martin Marietta Corporation, Polychrome Corporation, Varn Products Company, Incorporated, R.B.P. Chemical Corporation, Ryco-Line Solvent Company, Monarch Color Corporation, Van Son Holland Ink Corporation of America, Liberty Bronze Ink Company, Individually and as Representatives of the Class of Defendants named herein.**

**Civ. A. No. 81–1109.**

United States District Court,
E.D. Pennsylvania.

April 3, 1984.

**216**

Richard A. Sprague, Edward H. Rubenstone, Steve Alexander, Lawrence E. Hirsch, Sprague & Rubenstone, Philadelphia, Pa., for plaintiffs.

Abraham C. Reich, Jerome E. Ornsteen, Fox, Rothschild, O'Brien & Frankel, Philadelphia, Pa., for Chemical Industry Institute of Toxicology.

Sam L. Warshawer, Jr., Venzie, Phillips & Warshawer, Philadelphia, Pa., for Council of Chemical Associations.

Dean F. Murtagh, John F. Kennedy, Jr., German, Gallagher & Murtagh, Philadelphia, Pa., for Dow Chemical Co.

Henry T. Reath, Beatrice O'Donnell, Duane, Morris & Heckscher, Philadelphia, Pa., for Eastman Kodak Co.

Robert L. Hernandez, Boston, Mass., for Liberty Bronze Ink Co.

Jonathan Wheeler, Margolis, Edelstein & Scherlis, Philadelphia, Pa., for Martin-Marietta Corp.

John F. Kent, Deasey, Scanlan & Bender, Ltd., Philadelphia, Pa., for Minnesota Min. & Manufacturing Co.

Theodore H. Lunine, Bennett, Bricklin, Saltzburg & Fullem, Philadelphia, Pa., for Monarch Color Corp.

Steven A. Asher, LaBrum & Doak, Philadelphia, Pa., for National Art Materials Trade Assn.

Edward C. Toole, Jr., Clark, Ladner, Fortenbaugh & Young, Philadelphia, Pa., for National Ass'n of Printing Ink Manufacturers, Inc.

Anthony S. Minisi, Barry M. Klayman, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., for Polychrome Corp.

Edward C. Toole, Jr., Clark, Ladner, Fortenbaugh & Young, Philadelphia, Pa., for Printing Industries of America/Graphic Arts Equipment and Supply Dealers Ass'n.

Joseph I. Fineman, Philadelphia, Pa., for R.B.P. Chemical Corp.

Thomas C. DeLorenzo, Coleman & Goggin, Philadelphia, Pa., for Ryco-Line Solvent Co.

Peter P. Liebert, 3rd, Francis P. Burns, III, Liebert, Short, Fitzpatrick & Lavin, Philadelphia, Pa., for Van Son Holland Ink Corp. of America.

Robert M. Britton, Post & Schell, Philadelphia, Pa., for Varn Products Co.

## MEMORANDUM and ORDER

SHAPIRO, District Judge.

### I. FACTS

This products liability action was brought by Simon Klein and his wife, Ruth Klein, against eleven manufacturers and suppliers of chemical products used in the printing industry, four trade associations serving the chemical and printing industries and a research institute; they are named defendants individually and as representatives of a class of manufacturers, distributors, and/or suppliers. Jurisdiction was asserted by reason of diversity of citizenship. Plaintiffs alleged that Simon Klein contracted bladder cancer because he was exposed over a fifty-year period to certain carcinogens by "inhaling the fumes, mists, fogs, vapors and dusts of the various commercial chemical products then commonly used in the ... industry." Second Amended Complaint at ¶ 19(a).

Plaintiffs' original complaint was dismissed without prejudice on October 9, 1981 for failure adequately to allege subject matter jurisdiction. Plaintiffs filed a first amended complaint; seven defendants filed motions to dismiss for lack of jurisdiction or failure to state a claim. Plaintiffs filed a second amended complaint to cure the jurisdictional defects of the first amended complaint. By Order of June 30,

1983, the motion of defendant Council of Chemical Associations ("CCA") to dismiss for lack of personal jurisdiction was granted. The motion of defendants National Association of Printing Ink Manufacturers, Inc. ("NAPIM") to dismiss for lack of subject matter jurisdiction and for lack of venue were denied. The motions of defendant Chemical Industry Institute of Toxicology ("CIIT") to dismiss for lack of subject matter jurisdiction and lack of personal jurisdiction were denied; its motion to dismiss for failure to state a claim was taken under advisement. Subsequently, all defendants joined in motions to dismiss the second amended complaint.[1] After oral argument, the court held that the second amended complaint failed to state a cause of action. This opinion explains the court's ruling from the Bench and subsequent grant of the motions to dismiss.

It is alleged that Simon Klein was continuously employed in the letterpress and offset lithography industries and exposed to the various commercial chemical products commonly used in these industries for much of his working day during substantially all his adult life. ¶ 10(a). From 1933 to 1942, Klein was a broker in a letterpress business and spent a substantial portion of each workday in the press-room where it is alleged he necessarily inhaled various unidentified commercial chemical products. Then from 1942 to 1946, Klein served as a tank commander with the Army in Europe; nothing is alleged as to his exposure to chemicals during World War II.

From 1946 to 1962, Klein was a broker and then the owner of his own letterpress and offset lithography business. Again, it is alleged that he spent a substantial part of his working day in the enclosed confines of his business where he inhaled various unidentified commercial chemical products commonly used not necessarily in his business but generally in the industry. He sold his own business in 1962 and worked as a printshop contracting agent and nursing home administrator in Florida from 1962–1966. His exposure to chemical products during this period has not been asserted.

Klein returned to Philadelphia in 1966 as a manufacturer of printed ribbons and binder of books; this again subjected him to the inhalation of various unidentified commercial products used by him in these operations until 1967. From 1967 to 1970, Klein was an estimator and expeditor at a lithography company where he spent a significant part of each working day in the enclosed confines of the production plant where he inhaled fumes, mists, fogs, vapors and dust of commercial chemical products commonly used in the industry.

From 1970 to 1971 Klein, a self-employed broker of print jobs, spent a substantial portion of the working day at a printing company; thereafter, he was employed by the printing company for seven years. For the first two years as an outside salesman he spent a substantial portion of his working day in the production plant but after the company relocated to New Jersey he only spent a couple of hours of three days a week in the plant; the rest of his working time he spent in customers' offices. While in the production facilities, he inhaled byproducts of various commercial chemical products, identified only as those commonly used in the letterpress and offset lithography industries. From 1978 to 1979 Klein was a salesman, estimator and expeditor for a printing firm until he was hospitalized for treatment of bladder carcinoma.

Klein's carcinoma is alleged to be a latent occupational disease manifesting itself a substantial time after initial exposure to offending carcinogens that were a substantial factor in the inducement of his bladder carcinoma. The offending carcinogens were alleged to be one or more commercial chemical products (or agents contained as an ingredient of any of the products commonly used in the industries in which Klein

---

**1.** CIIT filed a motion to dismiss plaintiffs' first amended complaint for failure to state a claim upon which relief could be granted under Fed. R.Civ.P. 12(b)(6); this became moot upon the filing of the second amended complaint. CIIT's motion to dismiss is deemed a motion to dismiss the second amended complaint.

**218**

was employed) anytime during the time of his employment. Plaintiff contends the carcinoma could have been easily detected in its early stages by routine examination at which time it could have been easily and effectively treated in a less extensive and radical way than necessitated when actually diagnosed in March, 1979. ¶¶ 45, 47. It is further alleged that the letterpress industry commonly used "various commercial chemical products including film developers, fixative agents, roller washes and solvents, fountain solutions, ink dyes, ink thinners, ink fixatives, drying agents and other products currently unknown to plaintiffs." ¶ 21. Therefore, plaintiffs allege on information and belief that among the various unknown commercial chemical products generally described in the complaint were offending carcinogens manufactured, distributed and/or supplied by the named defendants or unnamed members of the defendant class and that Klein's exposure to these carcinogens was reasonably foreseeable and "alone or in synergistic fashion, proximately caused Mr. Klein's bladder carcinoma." ¶ 22.

The products are not named nor are the manufacturers. It is not stated that the products are unlabelled but it is alleged that no labels of any manufacturer, distributor or supplier enumerated the constituent chemical components or warned that the product contains a carcinogen or that persons using it should have periodic medical examinations to detect early bladder carcinoma. ¶ 23. It is stated that among these various chemical products, known and unknown, are certain

ink pigments and dyes selected from classes of compounds which, together with their metabolic products, have specifically been associated with bladder carcinoma in humans ... [, to wit,] (a) benzidines (e.g., 3–3 dichlorobenzidine, 1-naphthylamine, 2-napthylamine) and benzidine based dyes; (b) o-tolidine and o-tolidine based dyes; (c) o-dianisidine and o-dianisidine based dyes; and (d) azo-type dyes and diazonium compounds.

¶ 24. Plaintiffs further state, "magenta is a proven bladder carcinogen, while para

red and dinitroaniline orange are proven mutagens. Mutagenics are suspect carcinogenics." ¶ 25. Included among these chemical products are certain

organic solvents in inks and chlorinated hydrocarbon solvents in roller washes, type washes, fountain solutions, thinners, etc., some or all of which are specifically associated with bladder carcinoma in humans ... [, to wit] (a) toluene (which may contain benzidine contaminants); (b) xylene; (c) ethyl benzene; (d) methylene chloride; and (3) tetrachloroethylene.

¶ 26. Plaintiffs also include among the chemical products

anhydrous amonia, certain carcinogenic lead salts, new polymers in solventless inks which are used to bind pigment to the printed surface, and conventional plasticizers and oxidation accelerants used in inks. Each is highly toxic to humans. Plaintiffs allege on information and belief that one or more of the offending carcinogens will be found among this group of chemical products."

¶ 27.

Plaintiffs admit that they "are unable at this point to identify which of the various commercial chemical products described ... contain which of the various bladder carcinogens ... because no product label contains information identifying the constituent chemical agents or identifying the product as being or containing a bladder carcinogen." ¶ 28. They contend that defendants can and must determine with reasonable effort which commercial chemical products were commonly used in the letterpress and offset lithography industries from 1933–1942, 1946–1962, 1962–1966 (Florida), and 1966–1979 (¶ 30); they believe defendants can determine this from historical files and comprehensive product catalogs (¶ 29), and then determine from Material Safety Data Sheets for each product used in the past or now being used "the constituent chemical agents, said agents' degree of toxicity to humans, and the dangers attendant upon exposure." ¶ 31.

The defendant class is alleged to be a "class of manufacturers, distributors, and suppliers of the offending carcinogens, acting individually or in concert or conspiracy with one another as members of various trade associations and lobbying groups." ¶ 10(d). Various trade associations and lobbying groups to which these manufacturers, distributors and suppliers belong or whose activities they support are also unnamed members of the defendant class. *Id.* Plaintiffs view the named defendants as adequate representatives of this class because they manufacture, distribute or supply either the various unnamed chemical products containing carcinogens or the carcinogens themselves or, if a trade association, its members do so. ¶ 11.

Plaintiffs allege on information or belief that defendants have access to data proving or tending to establish the bladder-specific carcinogenesis of various chemical agents they use by reference to inhalation toxicology and that they have resisted attempts to compel dissemination of these reports not reasonably available to plaintiffs other than by discovery in this lawsuit. ¶ 32. Plaintiffs believe that by investigating the files of defendants to establish which chemical products containing carcinogens were shipped into Philadelphia and the Delaware Valley for use in the industry, they can determine the products involved and then identify the particular defendants that have been appropriately named in this litigation. ¶ 34.

Plaintiffs' complaint includes a section on the epidemiology of bladder tumors. ¶ ¶ 35–44. Relative to the motion is their assertion that in excess of 15,000 toxic chemical and physical agents are already in use in American industry. ¶ 35. Among the factors relevant to the incidence of bladder tumors are alleged to be race, sex, geographic location (industrialized nature of area; urban versus rural environment) and occupation. ¶ ¶ 37, 44. It is asserted that repeated occupational exposures increase the chance of developing bladder carcinoma and are an admitted hazard. ¶ 38. From this plaintiffs conclude that the unfamiliarity of these medical and health hazard statistics to the general public is "largely if not entirely" the responsibility of the "vast extent of industry domination over industrial hygiene, research, standard setting, and determination of disclosure requirements...." ¶ 39. For this failure to warn of carcinogens in the environment, failure to counsel persons in the printing industry to seek periodic routine medical examinations to detect latent carcinoma, failure to test various commercial chemical products to which industry employees were exposed for certain carcinogens, failure to make such products safe from carcinogenesis and for inclusion of carcinogenic chemical agents as ingredients in whatever commercial chemical products are ultimately determined to have them which rendered said products defective in design, members of the defendant class (defined as those who manufactured, supplied, distributed or did research about these products yet to be identified) are claimed liable to plaintiffs because exposure to these chemicals allegedly caused or was a substantial factor in inducing Klein's bladder carcinoma.

## II. DISCUSSION

Under Fed.R.Civ.P. 12(b)(6), "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957) (footnote omitted). "[T]he plaintiff is afforded the safeguard of having all its allegations taken as true and all inferences favorable to plaintiff will be drawn." *Mortensen v. First Federal Savings and Loan Association,* 549 F.2d 884, 891 (3d Cir.1977); *accord, Rogin v. Bensalem Township,* 616 F.2d 680, 685 (3d Cir.1980), *cert. denied sub nom., Mark-Garner Associates, Inc. v. Bensalem Township,* 450 U.S. 1029, 101 S.Ct. 1737, 68 L.Ed.2d 223 (1981) ("In reviewing the dismissal on the pleadings ... take all of the wellpleaded allegations ... as true, construe the [pleadings] in the light most favorable to [non-moving party], and deter-

mine whether, under any reasonable reading of the pleadings, the [party] might be entitled to relief." (footnote omitted)). Pennsylvania law applies in this diversity action.[2] *Baker v. Outboard Marine Corporation,* 595 F.2d 176, 182 (3d Cir.1979).

Viewing the 47 pages of plaintiffs' pleading as to the defendants and the printing industry in a light most favorable to plaintiffs, the Second Amended Complaint alleges that each defendant: 1) is strictly liable for and/or negligent in its failure to warn plaintiff of the hazards allegedly posed by the products used in the industry, whatever they may be (*see e.g.,* ¶ ¶ 50, 60, 62, 63, 78 and 79); 2) breached its implied warranty of merchantability (*see,* ¶ 75); 3) knowingly and intentionally inflicted severe emotional distress (*see,* ¶ 83); 4) caused a loss of consortium (*see,* ¶ ¶ 86–87); and 5) acted in conspiracy with other defendants to defraud plaintiffs (*see e.g.,* ¶ 64).

## A. COUNT I—TORT—STRICT LIABILITY OR NEGLIGENCE.

### 1. *Product Defendants:*

■ Plaintiffs' Second Amended Complaint alleges that the defendant product manufacturers are strictly liable or in the

alternative were negligent for placing in "the stream of commerce toxic chemical products ...." ¶ 59(a). Section 402A of the Restatement (Second) of Torts (1965), adopted in Pennsylvania,[3] provides:

One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his products, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

Plaintiffs allege defendants produced and/or distributed defective products generally used in the printing industry (¶ 57);

**2.** As jurisdiction is based upon diversity of citizenship, the court is required to apply the choice of law rules of the forum state, Pennsylvania. *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Jamison v. Miracle Mile Rambler, Inc.,* 536 F.2d 560 (3d Cir.1976). In tort actions Pennsylvania has adopted a flexible choice of law methodology. *Griffith v. United Air Lines, Inc.,* 416 Pa. 1, 203 A.2d 796 (1964); *Melville v. American Home Assurance Co.,* 584 F.2d 1306, 1311 (3d Cir. 1978). This analysis combines "interest analysis," a qualitative appraisal of the relevant states' policies with respect to the controversy, with the "significant contacts" analysis of the Restatement (Second) of Conflict of Laws (1971). *Melville, supra,* 1311–15; *Krick v. Carter,* 477 F.Supp. 152 (M.D.Pa.1979).

Pennsylvania has a significant interest in the outcome of the suit. Except for 8 of the 46 years covered by the complaint, the injuries occurred to a Pennsylvania citizen while he was employed in Pennsylvania. The state has a substantial interest in protecting its citizens from harm caused by defective products used in the state. *See, Miller v. Preitz,* 422 Pa. 383, 221 A.2d 320, 321, 328–341 (1966) (JJ. Jones and Roberts

concurring and dissenting) (stating policy behind strict products liability as cited with approval in *Webb v. Zern,* 422 Pa. 424, 220 A.2d 853 (1966) in adopting Section 402A of Restatement (Second) of Torts (1965) as law of Pennsylvania). Further, no defendant has suggested that another state has an interest in this matter.

Pennsylvania also has the most significant contacts with this litigation. Restatement (Second) Conflict of Laws § 145. Plaintiffs reside in Pennsylvania. The alleged injury occurred for the most part in Pennsylvania. The products which allegedly caused the injury may have been manufactured in another state, but they were allegedly sold and used in Pennsylvania. It appears, therefore, that the most significant contacts are with Pennsylvania.

Pennsylvania having the most significant contacts with and a substantial interest in the litigation, choice of law rules suggest that Pennsylvania law applies. Any manufacturer which sells or distributes products in a state should expect to be subject to the laws of that state. *Cf., Keeton v. Hustler Magazine, Inc.,* ___ U.S. ___, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984) (dictum).

**3.** *Webb v. Zern, supra.*

they allege Mr. Klein developed bladder cancer from exposure to products generally used in the printing industry. However, plaintiffs fail to allege the defective product(s) to which Mr. Klein was exposed. Not knowing which products caused his injury, he also does not know which, if any, of the defendants manufactured it or them.

This is not a defect which could be corrected by granting plaintiffs leave to amend their complaint;[4] plaintiffs concede that they cannot name any specific product to which Klein was exposed. Instead, plaintiffs intended to conduct extensive industry-wide discovery as to a period of more than fifty years in order to learn which products were shipped to the area where Klein worked in case some of them were bladder carcinogens. Plaintiffs in effect seek to put an industry on trial from the conviction that if Klein has been injured, it must be their fault. Plaintiffs contend that when harm is caused by the tortious conduct of two or more defendants and uncertainty exists as to which defendant caused it, the burden shifts to each defendant to prove that it did not cause the harm. *See,* Restatement (Second) of Torts § 433B(3) (1965); *Snoparsky v. Baer,* 439 Pa. 140, 266 A.2d 707 (1970); *Sommers v. Hessler,* 227 Pa.Super. 41, 323 A.2d 17 (1974); *Erlich v. Abbott Laboratories,* 5 Phila. 249 (1981); and *Pereira v. Dow Chemical Co.,* 129 Cal.App.3d 865, 181 Cal. Rptr. 364 (1982). Plaintiffs assert that the burden should be placed on each defendant to prove it did not cause Klein's cancer.

But this is not a case of mere uncertainty as to which of multiple defendants caused the harm; there is no good faith assertion that the harm was caused by any of them because plaintiffs have not and cannot identify a product sold or distributed by any of the defendants joined in this action. In the cases cited by plaintiffs in support of a theory of alternative liability, the instrumentality of the harm was known and the identification of the defendants with the

harm was clear. In *Snoparsky,* children were throwing stones at each other; one stone struck and injured the eye of the plaintiff; in *Sommers,* "spitballs" were thrown by children. In each case the instrumentality of the injury was known and the persons throwing the objects were known; what was unknown or impossible for plaintiff to prove was which of the several defendants actually threw the injuring object. In these cases, with known instrumentalities and a known group of actors, an alternative liability theory permitted a third party plaintiff to recover contribution from additional defendants.[5]

In the *Erlich* case, plaintiff's mother took the drug DES while pregnant with plaintiff; plaintiff claimed this caused her cancer. Plaintiff was at least able to identify a specific product causing her injury. Although she did not know which manufacturer sold the drug her mother took, all defendants manufactured the drug according to the same formula. DES "was marketed in such a way that only the pharmacist filling a given prescription would have known whose product he used; and physicians commonly prescribed the drug by its generic classification ('DES') rather than by any specific manufacturer's product designation." Plaintiffs' Consolidated Opposition to Defendants' Motions to Dismiss the First Amended Complaint, Paper Filed January 6, 1982, p. 30 n. 7. It was virtually impossible for plaintiff subsequently to identify the manufacturer of the pills taken by her mother. The *Erlich* court denied a motion for summary judgment in favor of twenty-three manufacturers allegedly supplying more than ninety percent of all DES sold in the relevant geographic area and time period.

Two factors distinguish *Erlich:* first, the plaintiff in *Erlich* identified the specific product causing her illness; she alleged *what* product she was exposed to if not *who* made it. Plaintiffs here do not name

---

4. *See,* Second Amended Complaint, ¶ 28.

5. These cases also involved intentional torts not strict liability of a product; the policy reasons for shifting the burden to intentional tortfeasors are not present where strict liability is imposed on the manufacturer of a product.

one product, even generically, to which Klein was exposed. Plaintiff in *Erlich* was unable to identify who made this product used by her mother for approximately one year thirty years before; no labels or pharmacy records were available for inspection.

This is not the case as to products Klein contacted as a salesman calling on the trade; there is no allegation the products were unknown or their manufacturers unidentifiable. Products used by Klein as a print shop owner were also known to him; their composition may be unknown, although available by chemical analysis. There is no allegation that these products were sold to a distributor, like the druggist in *Erlich*, who resold the products in containers without manufacturers' identifying labels. Indeed, plaintiffs allege that the product labels contained no enumeration of chemical components or warning of the health hazards. ¶ 23. This averment tends to confirm that these products were in fact labelled and not sold in unmarked containers.

Klein was in a position to know the products being used in his work environment. He was a front office person—he owned a business for a period of time; he had ample opportunity to learn what products were being used. Plaintiff's problem is not that he doesn't know the products allegedly involved but that he doesn't know which of the products contain the ingredient that has proved to be carcinogenic. Plaintiff is unwilling to specify products or manufacturers involved until he ascertains through discovery whether the products containing this substance entered the Philadelphia printing market during the period he was employed therein. This abuse of discovery turns the law of product liability on end. Injured plaintiffs may recover if a defective product causes them injury but prospective plaintiffs may not search for defective products in order to find something to which to attribute liability for their injuries. Plaintiffs were not hampered as in *Erlich* by a lapse of time from investigating which products were in the work-place. Klein began working in the printing indus-

try years ago and continued to do so until recently.

No case called to the attention of the court has applied a theory of alternative liability where the specific instrumentality of harm has not been identified. The inability of plaintiffs to name specific products is not due to marketing techniques or lapse of time but to plaintiffs' failure to investigate or unwillingness to be committed to allegations that may not ultimately sustain liability. Plaintiffs contend that the contents of printing industry products are not on their labels. But this would not preclude laboratory testing for carcinogens. Instead of identifying the products alleged to cause cancer and establishing contact with them, plaintiffs have sued every manufacturer, supplier, trade association or other entity associated with products used in the printing industry in the hope that one of them manufactured some product containing a specific carcinogen and that product was sent somewhere Klein happened to be in the years prior to the discovery of his disease. Plaintiff, having been associated with the printing industry for many years, seeks to make the manufacturers of products used by it the insurers of the health of those in the industry. But § 402A as adopted in Pennsylvania imposes liability for physical harm caused to the user only on one who has sold a product in a defective condition; a plaintiff must at least designate the product alleged to be defective in order to recover from one who sells it. These plaintiffs have failed to do so.

2. *Negligence:*

■ Plaintiffs' failure to identify a specific product also defeats their cause of action against these product defendants. To establish a cause of action for negligence, plaintiffs must prove:

1) a duty of care owed by the defendant to the plaintiff;

2) a breach of that duty; and

3) a causal relationship between defendant's breach of the duty of care and plaintiff's injury.

*Onufer v. Seven Springs Farm, Inc.,* 636 F.2d 46 (3d Cir.1980); *Mahler v. United States,* 196 F.Supp. 362 (W.D.Pa.1961), *aff'd,* 306 F.2d 713 (3d Cir.), *cert. denied,* 371 U.S. 923, 83 S.Ct. 290, 9 L.Ed.2d 231 (1962); W. Prosser, *Law of Torts* § 30, p. 143 (1971). Because plaintiffs have failed to identify a specific product, plaintiffs cannot allege a causal connection between conduct of the defendants and Klein's injuries. Plaintiffs have failed to allege a cause of action for negligence against the product defendants.

### 3. *Research Defendant:*

Defendant CIIT filed a motion to dismiss plaintiffs' first amended complaint for failure to state a cause of action which will be considered as a motion to dismiss the second amended complaint. In Count I, plaintiffs allege defendant CIIT is strictly liable or negligent for failure to warn them of the alleged harm of the products used in the printing industry. Defendant's motion to dismiss is granted on Count I.

CIIT, a non-profit corporation incorporated in 1974, has since then engaged in research and dissemination of information concerning toxic chemicals. It is "sponsored, organized and supported by the chemical industry." CIIT By-Laws, Docket No. 216, Exhibit A. CIIT has membership agreements with thirty-six companies.[6] Members are provided with copies of CIIT's research reports, free of charge, upon request. Research reports are also made available to non-members at cost. *Id.* 101. Drafts of research reports are sent to members for comment prior to preparation of the final report. *Id.* 79.

In order to state a cause of action for strict liability in tort a plaintiff must allege a sale or other commercial transfer of a product by the defendant. *Hahn v. Atlantic Richfield Co.,* 625 F.2d 1095 (3d Cir.1980), *cert. denied,* 450 U.S. 981, 101 S.Ct. 1516, 67 L.Ed.2d 816 (1981); Restatement (Second) of Torts § 402A. Section

402A has been adopted as the basis of strict tort liability in Pennsylvania. *Webb v. Zern,* 422 Pa. 424, 220 A.2d 853 (1966). Section 402A does not apply to those who provide a service. *Kohr v. Johns-Manville Corp.,* 534 F.Supp. 256, 260 (E.D.Pa.1982).

The complaint contains no allegation that defendant CIIT sold a product. Paragraph 63(b) of the Second Amended Complaint states the defendant class:

> Caused to be released, published and/or disseminated data and reports concerning the dangers and/or safety of their products, which data and reports they knew, and/or should have known and/or could have known determined to be incorrect, incomplete, out-dated and misleading....

Defendant CIIT's activities could be viewed as providing a service, rendering § 402A inapplicable, or as selling a "product"—research.

Viewing the complaint most favorable to plaintiffs, the court could conclude that defendant sold and does sell research, a "product" under § 402A; this view is consistent with the court's June 30, 1983 Memorandum finding sufficient contacts to warrant assertion of personal jurisdiction over defendant CIIT. But it is one thing to allege sufficient contacts for personal jurisdiction and another to allege sufficient contacts to involve § 402A. Although plaintiffs aver some unidentified data or reports about some unnamed products were released by the defendant class that they knew or should have known were "incorrect, incomplete, outdated and misleading" (¶ 63(b)), plaintiffs fail to and really could not allege that these reports were "in a defective condition unreasonably dangerous to the user or consumer;" Restatement (Second) of Torts § 402A(1). Even though lack of privity is immaterial, only other members of the defendant class, not plaintiffs, were the users or the ultimate consumers.

---

6. The amount of dues is determined by the member's net sales of chemicals. The membership agreement contains a three-year commitment; thus, a member who chooses to opt out of its agreement must pay dues for the current year plus the next two years.

If the research were a "product" shipped to CIIT members, it still is not a product designed to reach any consumer other than its members without substantial change in the condition in which it is "sold." CIIT's research, incorrect, incomplete, outdated or misleading, could not have been a substantial factor in, or the legal cause of, plaintiff's injuries. The failure and admitted inability to identify the products involved makes the allegation of defective research concerning those products meaningless. Without identifying the specific reports which were in a defective condition unreasonably dangerous to plaintiffs and a substantial factor in Klein's injuries, plaintiffs have not stated a cause of action for strict liability against defendant CIIT.

■■■ At oral argument, plaintiffs asked the court to extend products liability law in Pennsylvania to find that a research entity such as defendant CIIT has a duty to warn under § 402A of the Restatement (Second) of Torts as do manufacturers and sellers of products. Tr. pp. 22–27. Plaintiffs admit no Pennsylvania case has so held. *Id.* at 23. As the Third Circuit recently stated, "[w]hile a federal court must be sensitive to the doctrinal trends of the jurisdiction whose law it applies, it is beyond the authority of a federal court in such circumstances to create entirely new causes of action." *Wolk v. Saks Fifth Avenue, Inc.,* 728 F.2d 221 at 223 (3d Cir.1984).

■■■ Plaintiffs allege that defendant CIIT breached its duty to warn plaintiffs, in essence an application of the good samaritan doctrine of Restatement (Second) of Torts § 324A (1965): [7]

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

(a) his failure to exercise reasonable care increases the risk of such harm, or

(b) he has undertaken to perform a duty owed by the other to the third person, or

(c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

"[T]he scope of a good samaritan's duty is measured by the scope of his or her undertaking." *Patentas v. United States,* 687 F.2d 707, 716 (3d Cir.1982). "The foundation of the good samaritan rule is that the defendant specifically has undertaken to perform the task that he or she is charged with having performed negligently." *Patentas, supra. See e.g., Blessing v. United States,* 447 F.Supp. 1160, 1189 (E.D.Pa. 1978) (inspector of machinery only liable to injured worker if he actually inspected 1) the specific machinery or 2) the entire facility of which the machinery is a part).

Plaintiffs fail to identify any specific product to which Klein was exposed and which caused his injury. As a result, plaintiffs can allege no specific product which defendant CIIT tested about which it negligently failed to warn plaintiffs. Without such allegations, plaintiffs fail to state a cause of action against defendant CIIT for negligent discharge of a duty to warn.

Plaintiffs cite *Arnstein v. Manufacturing Chemists Association, Inc.,* 414 F.Supp. 12 (E.D.Pa.1976), in support of their cause of action against CIIT. In *Arnstein,* plaintiff brought suit against five chemical companies and a trade association for the death of her husband, a worker in the plants of the defendant chemical companies, from cancer allegedly caused by long-term occupational exposure to vinyl chloride. The trade association, moving for dismissal under Rule 12(b)(6), claimed that it owed no duty to plaintiff and there was no causal connection between their conduct and the death of plaintiff's decedent. Judge Fullam declined to determine these matters on a motion to dismiss. But in

---

**7.** Section 323 of the Restatement (Second) of Torts similarly embodies the good samaritan doctrine for those instances in which the injured party is the direct beneficiary of the services undertaken. *Patentas v. United States,* 687

F.2d 707, 714 (3d Cir.1982). This section is not applicable here where the alleged injured party is not a direct beneficiary but a third-party beneficiary of a service undertaken by a defendant.

*Arnstein,* the complaint identified a specific product (vinyl chloride), which the defendant trade association tested, to which decedent was exposed; defendant also had recommended a safe exposure level which was allegedly inadequate. *See,* ¶ 16 of Complaint in *Arnstein,* quoted in defendant CIIT's Reply Brief, filed February 4, 1983, p. 15. There were no such allegations here as to defendant CIIT. The failure to identify the product and consequently the defendant's conduct with regard to it required granting the motion to dismiss.

### 4. *Trade Association Defendants:*

NAPIM and the Printing Industries of America/Graphic Arts Equipment and Supply Dealers Association ("PIA/GAESDA") were named defendants.[8] They are trade associations whose members are manufacturers or dealers in the printing industry. These associations also moved to dismiss for failure to state a cause of action as to them.

■ It is apparent from the pleadings that these defendants do not produce or supply a product.[9] They cannot be held liable for injury caused to plaintiffs by a product. Therefore, Count I of the complaint is dismissed as to these defendants.

### B. COUNT II—BREACH OF WARRANTY.

#### 1. *Product Defendants:*

■ Count II alleges defendants breached an implied warranty of merchantability by placing products in the stream of commerce which eventually caused, or were a substantial factor in the inducement of, Klein's cancer. ¶ 72, *et seq.* Without identification of the specific products to which Klein was allegedly exposed, plaintiffs fail to state a claim. Count II is dismissed as to these defendants.

#### 2. *Research Defendants:*

Count II does not apply to CIIT for CIIT did not place any chemical product in the stream of commerce; if chemical research is deemed a product, it is not alleged to have caused plaintiff's injury. Therefore, Count II is dismissed as to CIIT.

#### 3. *Trade Association Defendants:*

Because NAPIM and PIA/GAESDA did not sell a product, Count II is dismissed as to them.

### C. COUNT III—RIGHT TO KNOW.

This Count is part and parcel of plaintiffs' Count I claim against these defendants for strict liability or negligence. For the same reasons as articulated for Count I, Count III is dismissed as to all defendants.

### D. COUNT IV—EMOTIONAL DISTRESS.

■ Plaintiffs allege the actionable conduct was done "knowingly" and "intentionally." ¶ 83. For a review of the analysis to be applied to claims of negligent infliction of emotional distress, *see, Amader v. Johns-Manville Corp.,* 514 F.Supp. 1031 (E.D.Pa.1981). *See also, Kimmel v. Peterson,* 565 F.Supp. 476 (E.D.Pa.1983). Recovery may be had for serious mental or emotional distress directly caused by intentional and wanton acts. *Papieves v. Lawrence,* 437 Pa. 373, 379, 263 A.2d 118, 121 (1970). *See, D'Ambrosio v. Pennsylvania National Mutual Casualty Insurance Co.,* 494 Pa. 501, 511 n. 8, 431 A.2d 966, 971–72 n. 8; *Banyas v. Lower Bucks Hospital,* 293 Pa.Super. 122, 437 A.2d 1236 (1981). The Restatement (Second) of Torts, § 46(1) (1965) provides:

> One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

"[T]he gravamen of this tort is that the conduct complained of must be of an extreme or outrageous type." *Jones v. Nis-*

---

**8.** CCA's motion to dismiss for lack of jurisdiction was earlier granted; Order of June 30, 1983.

**9.** To the extent NAPIM conducts research regarding industry products, the discussion of defendant CIIT, *supra,* as to the various counts in the complaint is applicable.

*senbaum, Rudolph & Seidner,* 244 Pa.Super. 377, 383, 368 A.2d 770, 773 (1977).

> Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

Restatement (Second) of Torts (1965) § 46, Comment (d).

■ Plaintiffs do not allege that defendants tested a certain, identified product, found it to be highly dangerous and carcinogenic and subsequently reported it completely safe to the public at large. Possibly this would have stated a cause of action. The complaint alleges defendant knew or should have known of the dangers of some unidentified product and somehow failed to warn plaintiffs. Even if defendants were negligent or strictly liable to plaintiffs, defendants' inaction over a long period of time is not the extreme or outrageous conduct for which there is recovery under Pennsylvania case law. Plaintiffs' complaint fails to state a cause of action for intentional infliction of emotional distress. *Cf., Papieves, supra* (defendant struck plaintiff's son, killed him and hid the body without informing plaintiff or the authorities); *Chuy v. Philadelphia Eagles Football Club,* 595 F.2d 1265 (3d Cir.1979) (applying Pennsylvania law) (team doctor, knowing that a player did not have a disease, told press that player was suffering from it).

### E. COUNT V—LOSS OF CONSORTIUM.

■ Both plaintiffs assert a cause of action for loss of consortium. Under Pennsylvania law, a spouse of a party recovering on the ground of strict product liability may also recover from the tortfeasor for loss of consortium. *Reuter v. United States,* 534 F.Supp. 731, 733 (1982); *Hopkins v. Blanco,* 457 Pa. 90, 320 A.2d 139 (1974). However, the recovery rights of the noninjured spouse are derivative of the rights of the injured spouse. *Little v. Jarvis,* 219 Pa.Super. 156, 280 A.2d 617 (1971). Had Klein established liability, loss of life's pleasures would have been an element of his damages. But in view of the dismissal of the complaint, Klein cannot recover and Mrs. Klein's claim for loss of consortium must also be dismissed. Since there is no allegation in the complaint that Mrs. Klein has been injured, Klein has no claim for loss of consortium.

### F. COUNT VI—CONSPIRACY TO DEFRAUD.

■ Although not a separate count in the complaint, plaintiffs averments contain references to an alleged conspiracy to conceal or defraud on the part of all defendants.[10] For example, the complaint alleges that "[d]espite the ... data possessed by and available to them, the defendants, acting ... in conspiracy with each other ... concealed said data from the public ...." ¶ 63; defendants "in conspiracy with each other, participated in the fraudulent schemes ...." ¶ 64. There are no factual averments in support of this claim. This is not sufficient.[11]

■ Federal Rule of Civil Procedure 9(b) provides, in pertinent part, that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake, shall be stated with particularity." *See, Perma Research and Development Co. v. Singer Co.,* 410 F.2d 572, 576 (2d Cir.1969)

---

10. *See e.g.,* Second Amended Complaint at ¶ ¶ 10(d), 13(b), 63 and 64.

11. The conspiracy and class allegations may be an attempt to negate the Statute of Limitations defense on the ground of tolling. Plaintiffs allege exposure to carcinogens for various unknown commercial chemical products from 1933 until Klein's hospitalization in 1979. His bladder carcinoma was first diagnosed on March 20, 1979; the complaint was filed March 1, 1981. Actions to recover damages for personal injury are governed by a two-year limitations period but actions for breach of warranty under the Commercial Code, including claim for personal injuries are governed by the four-year limitations period provided in § 2–725; *Williams v. West Penn Power Co.,* 502 Pa. 557, 467

(mere allegation that contract was obtained by fraud insufficient to state a claim under Rule 9(b)). Complaints alleging conspiracy to conceal or defraud must state the time, place and circumstances of the conspiracy, as well as what was concealed or misrepresented. *Greater Valley Terminal Corp. v. Peltz St. Terminals, Inc.*, 21 F.R.D. 167, 168 n. 2 (E.D.Pa.1957). Plaintiffs failed to allege what data was concealed, how, when, or under what circumstances; the allegations of conspiracy are conclusory and insufficient to state a cause of action.[12]

## G. DEFENDANT CLASS ACTION.

Plaintiffs, filing this complaint as a defendant class action under Fed.R.Civ.P. 23(a), (b)(1)(A) and (b)(3), allege that the named defendants represent a class of defendants who placed products in the stream of commerce which caused Klein's injuries.

The party moving for certification of a class has the burden of showing the class meets the requirements of Rule 23. Plaintiffs would have had a difficult if not impossible task sustaining their burden because of their inability to link any particular defendant with Klein's injuries. Although plaintiffs allege an industry-wide practice of placing carcinogens in printing industry products, they are unable to say which of the named defendants supplied such products to Klein's places of employment or how many members of the putative class supplied such products. Plaintiffs would have been unable to show that the class is so numerous that joinder ·is impractical. Rule 23(a)(1). Plaintiffs cannot show one defendant supplied a carcinogenic product to which Klein was exposed, much less estimate the number in a defendant class. *See, Manning v. Princeton Consumer Discount Co., Inc.*, 390 F.Supp.

320, 324 (E.D.Pa.1975), *aff'd*, 533 F.2d 102, 104 (3d Cir.), *cert. denied*, 429 U.S. 865, 97 S.Ct. 173, 50 L.Ed.2d 144 (1976). Similarly, plaintiffs would have been unable to show commonality of fact among class members. Rule 23(a)(2); *Manning, supra.* Without knowing which products were in Klein's workplace, plaintiffs would not have been able to show that the defenses of the named class members are typical of defenses of the class, except that all have the defense that Klein cannot assert the products to which he was exposed so he cannot know if they are properly named defendants. That all the defendants may be improper parties to the suit for this reason is not the commonality intended under the Rule. Moreover, one defendant improperly named cannot be said to fairly and adequately protect interests of other unknown class members not properly named as defendants. Without meeting the prerequisites of Rule 23(a), a class is not maintainable.

Even if the prerequisites of Rule 23(a) could be met, plaintiff must establish in addition the requirements of either (b)(1), (2) or (3). Rule 23(b)(1) is inapplicable because prosecution of separate actions against individual members of this class of unknown defendants does not create a risk of inconsistent or varying adjudications with respect to individual members of the defendant class establishing incompatible standards for plaintiff (Fed.R.Civ.P. 23(b)(1)(A)). Nor would adjudications with respect to individual named manufacturers, distributors, suppliers or research organizations be dispositive in any way of the interests of unnamed manufacturers, suppliers or research entities or impede them in any way. (Fed.R.Civ.P. 23(b)(1)(B)). Plaintiff does not seek injunctive or declaratory relief under Fed.R.Civ.P. 23(b)(2) and

---

A.2d 811 (1983), *overruling Salvador v. Atlantic Steel Boiler Co.*, 256 Pa.Super. 330, 389 A.2d 1148 (1978). It does not appear on the face of the complaint that plaintiffs knew or had reason to know of Klein's bladder tumor prior to March, 1977 but the allegation of conspiracy to conceal the defective products of unknown manufacturers might be an attempt to preserve claims against unnamed manufacturers of products still to be identified.

**12.** Plaintiffs' counsel at oral argument stated, "[a]s to CIIT, it tells [industry manufacturers] yes or no, the products are beneficial, harmful, non-harmful and *conceivably* it could cooperate with them in concealing the harmful effects of a product known to be harmful." (Transcript of August 31, 1983 oral argument at p. 20 (emphasis supplied)). Speculation and conjecture are inadequate.

it is clear that certification under Fed.R. Civ.P. 23(b)(3) would be inappropriate for lack of predominance of common questions.

The divergence of individual defendants and the inability of plaintiffs to identify any specific defendant as the source of the instrumentality causing Klein's injuries would have rendered a 23(b)(3) defendant class unmanageable. In these circumstances, a class action cannot fairly be said to be fair, efficient or superior to ordinary tort litigation.

Plaintiffs attempt to certify a defendant class not for injunctive or declaratory relief, but for damages from an entire class of tortfeasors, to secure damages from a class of defendants both known and unknown, whether they are tortfeasors or not, for injuries allegedly caused by a defendant product or products unknown. This is yet another attempt by plaintiffs to circumvent the fatal defect in their complaint—the lack of any specific product identification. ¶ 28. For these reasons a class action cannot be maintained.